## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **Metropolitan Life Insurance Co.,** | **Case No. 1:19-cv-1657** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Kenya Little,** *et al.***,** | |
| **Defendants** | **MEMORANDUM OPINION AND ORDER** |

This is an interpleader action in which two sisters, Sharon Little ("Sharon") and Kenya Little ("Kenya"), assert competing claims to decedent Reuben Little's life insurance proceeds, payable under a group plan that Metropolitan Life Insurance Company ("Metlife") issued through the decedent's former employer, General Motors ("GM").  The Court held a bench trial in this matter on August 4, 2021.  After reviewing the evidence presented at trial, as well as the documents filed with Metlife's Complaint in Interpleader, the Court finds that the 8/27/2011, 4/9/2011, and 4/17/2009 designations are invalid and the 2/23/1982 designation is valid and controls the disbursement of the life insurance proceeds.

## I.    Background

### A.    Uncontested Facts[1]

Reuben Little ("Reuben") died on January 22, 2019 in Cleveland, Ohio.  (Doc. No. 1-1.) Reuben was previously employed by General Motors GM.  (Doc. No. 1-2.)  As a GM employee, Reuben participated in the GM Group Life Insurance Program (the "Plan").  (*Id.*)  The Plan is an

---

[1] During the 8/4/2021 bench trial, both Sharon and Kenya stipulated to the facts set forth in this subsection.  *See* 8/4/2021 Transcript, 1:20-12:24.

employee welfare benefit plan subject to and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, and funded by a group life insurance policy, #25090-6, issued by Metlife.  (*Id.*)  At the time of his death, Reuben was covered for $12,150 in Basic Life insurance benefits under the Plan.  (*Id.*)  These benefits became payable to Reuben's designated beneficiary upon his death.  (*Id.*)

Under the terms of the Plan, Metlife, as claims fiduciary, is responsible for administering Plan claims pursuant to ERISA and the documents governing the Plan.  (*Id.*)  According to the Plan, upon the death of the covered employee, "the amount of Life insurance in force on account of the Employee at the date of the Employee's death shall be paid to the Beneficiary of record."  (*Id.* at PageID#15.) The Plan defines a Beneficiary as follows:

> The beneficiary is the person or persons designated by the Employe[e], on a form approved by the Insurance Company and filed with the records maintained by the Employer in connection with the insurance under the Group Policy, to receive upon the Employe[e]'s death the amount of Life Insurance then payable.  The Employe[e] may change the Beneficiary at any time by filing written notice thereof on such a form with the Employer.  Consent of the Beneficiary shall not be requisite to any change of Beneficiary. . . . After receipt of such written notice by the Employer, the change shall relate back and take effect as of the date the Employe[e] signed said written notice of change, whether or not the Employe[e] is living at the time of such receipt, but without prejudice to the Insurance company on account of any payment made before receipt of such written notice.

(*Id.*)  According to GM's Summary Plan Description, a handbook for UAW Retirees and Eligible Survivors, Reuben's Basic Life insurance proceeds are "payable to the latest beneficiary (or beneficiaries) you have designated on a form approved by the life insurance Carrier, provided the beneficiary (or beneficiaries) is alive at your death."  (Doc. No. 1-3, PageID# 60.)

2

When Reuben died, his beneficiary was entitled to $12,150 in Basic Life insurance benefits under the Plan. (Doc. No. 1-2.) At the time of his death, Reuben had four beneficiary designation forms on file with Metlife. Those designations, in order of latest to earliest, are as follows:

1. **August 27, 2011 (the "8/27/2011 designation"):** On 8/27/2011, Reuben designated Kenya M. Little as the sole primary beneficiary, with a 100% share of the Plan benefits. The 8/27/2011 designation denotes Kenya as Reuben's daughter. Reuben designated Trey Walker as the sole contingent beneficiary, with a 100% share of the Plan benefits. The 8/27/2011 designation denotes Trey Walker as Reuben's grandson. Reuben's name is handwritten in print at the bottom of the form. Reuben's handwritten signature is also located at the bottom of the form. The 8/27/2011 designation was notarized by a notary with the last name "Miller." (Doc. No. 1-4.)

2. **April 9, 2011 (the "4/9/2011 designation"):** On 4/9/2011, Reuben designated Sharon Little as the sole primary beneficiary, with a 100% share of the Plan benefits. The 4/9/2011 designation denotes Sharon as Reuben's child. Reuben designated Darnell Little as the sole contingent beneficiary, with a 100% share of the Plan benefits. The 4/9/2011 designation denotes Darnell Little as Reuben's child. The 4/9/2011 designation does not contain Reuben's handwritten signature, but the words "E-signed by Reuben Little Jr." appear at the bottom of the form. (Doc. No. 1-5.)

3. **April 17, 2009 (the "4/17/2009 designation"):** On 4/17/2009, Reuben designated Kenya M. Little as the sole primary beneficiary, with a 100% share of the Plan benefits. The 4/17/2009 designation denotes Kenya as Reuben's daughter. Reuben designated Trey Walker as the sole contingent beneficiary, with a 100% share of the Plan benefits. The 4/17/2009

3

designation denotes Trey Walker as Reuben's grandson.  Reuben's name is handwritten and signed at the bottom of the designation form.  (Doc. No. 1-6.)

4. **February 23, 1982 (the "2/23/1982 designation"):** On 2/23/1982, Reuben designated Sharon Little, his daughter, as the first beneficiary, with a 50% share of the Plan benefits. Reuben next designated Shareba Walker, his daughter, as the second beneficiary, with a 12.5% share of the Plan benefits.  Reuben then designated Terrance Walker, his son, as the third beneficiary, with a 12.5% share of the Plan benefits.  Reuben then designated Damone Walker, his son, as the fourth beneficiary, with a 12.5% share of the Plan benefits.  Reuben finally designated Kenya Walker, his daughter, as the fifth and final beneficiary, with a 12.5% share of the Plan benefits.  The 2/23/1982 designation is endorsed by an individual named Nancy Roda, on the employer's behalf.  (Doc. No. 1-7.)

Following Reuben's death, Metlife received certain records[2] that caused it to question the validity of Reuben's various beneficiary designations.  Those records included:

1. **July 27, 2011 expert evaluation from Dr. Quratulain Syed:**  On 7/27/2011, Dr. Quratulain Syed, a doctor with the Cleveland Clinic's Section of Geriatrics/Department of Internal Medicine, issued a written evaluation of Reuben's health and well-being, at the request of Adult Protective Services.  (Doc. No. 1-9.)  Dr. Syed evaluated Reuben on May 18, 2011 and July 27, 2011.  (*Id.*)  Dr. Syed evaluated Reuben for 60 minutes or more at each visit.  (*Id.*)   Dr. Syed wrote that Sharon accompanied Reuben to his 7/27/2011 evaluation and that Sharon expressed several concerns including that Reuben continued to drive his car

---

[2] Per 8/4/2021 bench trial, Sharon and Kenya do not dispute the authenticity of these records.  *See* 8/4/2021 Transcript, 1:20-12:24, 36:7-40:2.

and accrue multiple tickets, despite no longer having car insurance; that Kenya was financially exploiting Reuben by depleting his savings accounts and utilizing his credit; that Reuben lived in a dirty and cluttered house infested with bugs; and that it was unclear how often Reuben ate, because he didn't cook and seemed to be losing weight.  (*Id.*)  Dr. Syed also conducted a physical examination of Reuben.  (*Id.*)  Dr. Syed noted that Reuben appeared disheveled, weak, and his gait unstable. (*Id.*)   Further, Reuben exhibited impaired judgment and memory problems.  (*Id.*)  Dr. Syed opined that Reuben was unable to make any complex decisions and would benefit from the designation of a guardian to ensure Reuben's safety, as well as the safety of those around him.  (*Id.*)  Dr. Syed submitted his evaluation to the Probate Court of Cuyahoga County, Ohio in the case captioned *In re Matter of the Guardianship of Reuben Little*, 2011 GDN 0171425.  (*Id.*)

2. **December 2, 2011 Letters of Guardianship:** On 12/2/2011, Judge Anthony Russo of the Probate Court of Cuyahoga County appointed Sharon as guardian for Reuben's person and estate.  (Doc. No. 1-8.)  According to the Letters of Guardianship, Sharon's guardianship powers were for an indefinite time-period.  (*Id.*)

3. **May 1, 2012 Judgement Entry Against Kenya:** On 5/1/2021, in the case captioned *Sharon Little, as Guardian of the Estate of Reuben Little, Jr., v. Kenya Little*, Judge Laura J. Gallagher of the Cuyahoga County Court of Common Pleas entered judgment in favor of Sharon, as Reuben's guardian, and against Kenya.  (Doc. No. 1-10.)  In that case, Sharon alleged that Kenya was aware that Reuben was incompetent, but nevertheless accessed Reuben's funds and credit for her own benefit.  (*Id.*)  Sharon presented evidence that Kenya was guilty of concealment of assets belonging to Reuben's estate.  (*Id.*)  Kenya testified on

5

her own behalf and presented her mother as a witness.  (*Id.*)  Kenya testified that her father

wanted her to share his assets, but also that Reuben became suspicious that someone was

taking all of his money so he transferred his money to a different account to which Kenya still

had access.  (*Id.*)  Kenya also testified that she did not keep track of how much of Reuben's

money she accessed.  (*Id.*)  Judge Gallagher concluded the following:

> 1. That, from at least 2009 forward, Reuben began exhibiting signs of
> forgetfulness and confusion and was having difficulty managing his finances;
>
> 2. That during this same period, Kenya had access to Reuben's bank accounts
> and credit;
>
> 3. That Sharon presented thorough bank records that demonstrated that
> $70,088.79 of Reuben's money was unaccounted for;
>
> 4. That Kenya was aware of Reuben's vulnerability and that Kenya used her
> position as Reuben's "baby" to "unduly influence" Reuben to allow Kenya
> access to his accounts;
>
> 5. That Kenya proceeded to utilize Reuben's assets for her own benefit and did
> not account to Reuben for the funds she spent; and
>
> 6. That Kenya was guilty of concealment in the amount of $70,088.79, plus
> 10% interest.

(*Id.*)  Accordingly, Judge Gallagher entered judgment against Kenya and in favor of Sharon,

as Reuben's Guardian, in the amount of $70,088.79 plus a 10% penalty and costs for the

action.  (*Id.*)

After reviewing these records, Metlife concluded that there were disputed issues of law and

fact regarding Reuben's competence and/or whether Reuben was the victim of undue influence when

he executed the 8/27/2011, 4/9/2011, and 4/17/2009 beneficiary designations.  Unable to determine

to whom the Plan's benefits should be paid, Metlife initiated this interpleader on July 22, 2019. (Doc.

No. 1.)  On July 8, 2020, Metlife deposited the full $12,150 with the Court's registry and was dismissed with prejudice from this case.  (Doc. No. 41.)

### B.    Bench Trial Testimony

Sharon and Kenya each testified on their own behalf during the 8/4/2021 bench trial.  Each party had the opportunity to cross-examine the other.  The Court also asked questions of each party during their testimonies.  The Court will briefly summarize each party's testimony below.

#### 1.    Sharon Little's Testimony

Sharon is 65 years old and one of Reuben's children.  8/4/2021 Transcript, 14:13-22.[3]  Sharon believes that Reuben had 17 children.  *Id.* at 14:24.

According to Sharon, around 2008, Reuben began "showing some issues of not [being] able to keep up with his payment of bills . . . ."  *Id.* at 16:8-13.  Sharon testified that that was out of character for Reuben and that, prior to that point, Reuben had always kept up with his bills and paid them on time.  *Id.*  Due to his forgetfulness and inability to pay his bills, Sharon and some of Reuben's other children called Adult Protective Services around December 2010.  *Id.* at 15:5-14, 16:4-5.  Sharon also testified that between 2008 and 2010, Reuben began "getting calls from creditors that he didn't understand" and that "he had them call" her instead because he didn't understand why he was receiving such calls.  *Id.* at 17:3-7.  Sharon testified that one creditor that called Reuben was JCPenney.  *Id.*  Sharon testified that Reuben was confused and didn't understand why JCPenney continued to call him between 2010 and 2011 about late payments because Reuben never opened a JCPenney account.  *Id.* at 17:7-13.

---

[3] All transcript citations are to the rough 8/4/2021 *MetLife v. Kenya Little, et al.* bench trial transcript.

In May and July 2011, Reuben underwent a geriatric assessment with Dr. Syed.  *Id.* at 18:19-19:12.  (*See also* Doc. No. 1-9.)  According to Sharon, she accompanied Reuben to the evaluation and also provided information to Dr. Syed about her father.  *Id.*  Sharon testified that neither she nor Kenya was in the room while Dr. Syed examined her father.  *Id.* at 20:7.

Sharon also testified about the 4/9/2011 designation, in which Reuben purportedly designated Sharon as sole beneficiary and signed via electronic signature.  *Id.* at 20:22-22:20.  According to Sharon, she and some of Reuben's children held a family meeting to address concerns about Reuben's unhealthy living conditions.  *Id.*  Sharon testified that, as the oldest sibling living in Cleveland, she would be the sibling to "get a handle" on the situation.  *Id.*  She contacted "some of the GM people" about Reuben's situation and received an electronic beneficiary designation form for the Plan.  *Id.*  Sharon "assumed" she had the authority to file the electronic beneficiary designation form on Reuben's behalf because she was in the process of filing for guardianship over Reuben.  *Id.*  However, Sharon admitted that, as of 4/9/2011, she had *not* yet been appointed as Reuben's guardian by the Cuyahoga County Probate Court.  *Id.* at 22:11-23:5.

Finally, Sharon testified that she paid for all of Reuben's end-of-life services, which totaled approximately $3,000.  *Id.* at 26:22-27:3.

On cross-examination, Sharon admitted that she, not Reuben, executed the 4/9/2011 designation form, before Sharon ever became Reuben's guardian.  *Id.* at 23:25-24:3.  Sharon further asserted that it was her position that the Court should not rely on the previous 4/17/2009 designation, but should revert back to the 2/23/1982 designation.  *Id.* at 25:21-26:14.

Following the close of each party's testimony, the Court asked the parties a series of questions related to Reuben's mental and physical condition in April 2009 and the circumstances surrounding

his execution of the 4/17/2009 designation.  With respect to those questions, Sharon testified that she became extremely concerned about her father's mental and physical well-being around 2009 when she noticed he began hoarding and developed a bed bug infestation in his home.  *Id.* at 52:10-17.  She testified that his physical appearance began to deteriorate around that time and that he was unkempt.  *Id.* at 52:23-53:7.  According to Sharon, Reuben was embarrassed by his deteriorating living condition and refused to allow his son, who lived in Alaska, to visit inside of his home in 2009.  *Id.* at 53:11-20.  Sharon believed that was another sign that Reuben's mental and physical well-being were in decline.  *Id.*  Sharon also testified that Reuben began borrowing money around 2009, which she believed was out of character for him.  *Id.* at 54:6-10.

Sharon also testified that, to her knowledge, Reuben did not receive any disinterested advice with respect to designating his Plan beneficiaries or other financial matters.  *Id.* at 56:12-19.

Sharon testified that she did not know why Reuben executed the 4/17/2009 designation, in which he designated Kenya as sole beneficiary.  *Id.* at 61:12-14.

Sharon also testified that she believed that Kenya attempted to restrict Reuben's contact with other members of his family.  *Id.* at 66:16-20.  She believed that Reuben's "phone was always off" to prevent him from talking with other family members.  *Id.*  According to Sharon, Reuben's phone was disconnected because his phone bills went unpaid.  *Id.* at 67:5.  Sharon believed that Kenya lived with Reuben at the time and purposely neglected to pay the phone bills to prevent contact between Reuben and his other children.  *Id.* at 67:16-25.

Sharon further testified that Reuben continued to drive his car up until the day that the guardianship went into force in November 2011 and that he drove while incompetent.  *Id.* at 70:19-

9

20. Sharon also testified that, as of April 2009, she understood that "nobody had control but" Reuben over his financial affairs. *Id.* at 71:3-7.

### 2.     Kenya Little's Testimony

Kenya is 41 years old and the youngest of Reuben's children. *Id.* at 28:1-5.  She believes Reuben had 15 or 16 children. *Id.* at 28:7.

Kenya testified that the reason Reuben stopped paying his bills around 2008 was because "he was a victim of identity theft." *Id.* at 28:15-21.  Kenya asserted that Reuben's bills did not go unpaid because he "was incompetent and he forgot, he didn't know how to pay his bills anymore." *Id.* Instead, she believes they went unpaid because he was a victim of identity theft. *Id.*

Kenya further testified that her father insisted that Kenya go with him to the GM office in Parma, Ohio so that Reuben could execute the 4/17/2009 designation. *Id.* at 29:1-31:4.  Kenya asserted that her father was "clear and competent" in April 2009 and was only "diagnosed incompetent" two years later. *Id.*  According to Kenya, Reuben picked her up from her house on 4/17/2009 and drove her to GM's administrative offices so that he could designate Kenya as sole beneficiary. *Id.*  Kenya testified that she witnessed her father sign the 4/17/2009 form at the GM administrative office and that she believed he was competent at that time. *Id.*

The Court inquired as to whether Kenya had a response to Sharon's testimony that Reuben had difficulty paying his bills as early as 2008. *Id.* at 31:6-8.  Kenya reiterated her testimony that she believed Reuben was a victim of identity theft. *Id.* at 31:14-22.  She testified that he previously had $107,000 in an account at KeyBank, but that the account was "wiped out" and that was why his bills went unpaid. *Id.*  Kenya further testified that Reuben did not open a JCPenney credit card, but that Reuben allowed her to open a JCPenney account in his name. *Id.* at 32:6-23.  She further testified

10

that it was true that she did not pay the balances owed on the credit card, which prompted JCPenney to call Reuben, the cardholder.  *Id.*

Kenya also testified as to Judge Gallagher's 5/1/2012 judgement entry in *Sharon Little, as Guardian for Reuben Little v. Kenya Little*.  Kenya generally disputed the substance of Judge Gallagher's conclusions, but agreed that Judge Gallagher concluded that Kenya was aware of Reuben's vulnerability and used her position as Reuben's "baby" to unduly influence Reuben.  *Id.* at 39:1-11.  Kenya also agreed that Judge Gallagher concluded that Kenya utilized Reuben's assets for her own benefit and that Judge Gallagher found her guilty of concealment of $70,088.79 from Reuben's estate.  *Id.* at 39:12-24.

With respect to the 8/27/2011 designation, Kenya testified that she "had found out what [her] sister Sharon had did in just changing the life insurance policy herself from [Kenya] to [Sharon], and [Kenya] didn't know what else [she] could or should do."  *Id.* at 40:18-21.  Kenya testified that she did not remember where Reuben signed the form or how she obtained a copy of the form, but admitted that Reuben was indeed incompetent when he signed the 8/27/2011 designation.  *Id.* at 41:19-42:6. She further asserted that she was not relying on the 8/27/2011 designation, but the 4/17/2009 designation.  *Id.* at 42:9.

Following the close of each party's testimony, the Court asked the parties a series of questions related to Reuben's mental and physical condition in April 2009 and the circumstances surrounding his execution of the 4/17/2009 designation.  With respect to those questions, Kenya testified that Reuben was always a hoarder and that no one was ever allowed inside their house growing up, so it would not have concerned her that Reuben's son from Alaska was not allowed inside Reuben's house.

11

*Id.* at 54:21-55:13.  She further testified that his mental and physical health were fine and that she did not see any deterioration in his outward appearance or manner of dress.  *Id.* at 56:2-9.

Kenya also testified that, to her knowledge, Reuben did not receive any disinterested advice with respect to designating his Plan beneficiaries or other financial matters.  *Id.* at 56:12-57:5.

With respect to the 4/17/2009 designation, Kenya testified that she did not remember whether the GM representative provided Reuben with the beneficiary designation form when they arrived to the GM office, or if Reuben obtained the form another way.  *Id.* at 61:22-25.  She testified that Reuben insisted that she go with him to GM to change the beneficiary designation form several times before 4/17/2009 and that, on 4/17/2009, he pulled up in his car unannounced and told her that they were going to go change the form.  *Id.* at 62:6-10.  Kenya testified that she did not remember leaving GM with a copy of the 4/17/2009 designation.  *Id.* at 63:9-14.

Kenya did not refute Sharon's assertions that Kenya isolated Reuben from his other children by refusing to pay his phone bills, although she admitted that she knew Reuben's phone service was sometimes cut off because the bills were not paid.  *Id.* at 68, 69:3-5.  Rather, Kenya testified that she did not live with Reuben in 2009 and that he was unable to pay his bills at that time because he was the victim of identity theft.  *Id.* at 68:16-69:11.

Kenya testified that, as of April 2009, she did not have "complete control" over Reuben's financial affairs, but that she "assisted" Reuben with "bill paying and stuff like that."  *Id.* at 71:11-23.  According to Kenya, she did not write checks but instead paid his bills in cash.  *Id.*  However, Kenya also testified that she did not pay his mortgage and that she could not remember which specific bills she paid on Reuben's behalf.  *Id.* at 71:25-72:5.

12

## II.    Applicable Law

As a general matter, "claims touching on the designation of a beneficiary of an ERISA-governed plan fall under ERISA's broad preemptive reach and are consequently governed by federal law." *Tinsley v. Gen. Motors Co.*, 227 F.3d 700, 704 (6th Cir. 2000).  ERISA requires a plan administrator to determine the appropriate beneficiary strictly "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104(a)(1)(D).  Accordingly, the Court must look to the language of ERISA to determine the beneficiary.  *Metropolitan Life Ins. Co. v. Pressley*, 82 F.3d 126, 130 (6th Cir. 1996).  Under ERISA, the plan document designating a particular individual as beneficiary ordinarily controls.  *Id.*

However, the rule that courts "need not look beyond the beneficiary designation form to determine the appropriate beneficiary" is inapplicable where "the *validity of a plan document itself* is in question."  *Tinsley*, 227 F.3d at 704 (emphasis added).  ERISA does not contain "any provisions regulating the problem of beneficiary designations that are forged, the result of undue influence, or otherwise improperly procured . . . ."  *Id.*  Therefore, the Court "must 'look to either the statutory language or, finding no answer there, to federal common law which, if not clear, may draw guidance from analogous state law.'"  *Id.* (quoting *McMillan v. Parrott*, 913 F.2d 310, 311 (6th Cir. 1990)).  There are no provisions in ERISA that govern disputes over whether an insured lacked the mental capacity to execute a beneficiary designation, or whether an insured was the victim of undue influence.  *Id.*  Accordingly, where there is no federal statutory law to apply in ERISA cases, the Court must seek guidance in federal common law.  *Id.  See also*, *e.g., Metropolitan Life Ins. Co. v.*

13

*McCloskey*, No. 1:03-CV-1523, 2005 WL 3877436, at *2 (N.D. Ohio Dec. 23, 2005); *Metropolitan*

*Life Ins. Co. v. Williams*, No. 1:09-cv-1765-TCB, 2010 WL 11598072, at *6 (N.D. Ga. Aug. 3, 2010).

### A.      Capacity to Execute Beneficiary Designation

Under federal common law, "[t]o be capable of effecting a valid change of beneficiary a

person should have clearness of mind and memory sufficient to know the nature of the property for

which he is about to name a beneficiary, the nature of the act which he is about to perform, the names

and identities of those who are the natural objects of his bounty; his relationship towards them, and

the consequences of his act, uninfluenced by any material delusions." *Metropolitan Life Ins. Co. v.*

*McCloskey*, No. 1:03-CV-1523, 2005 WL 3877436, at *2 (N.D. Ohio Dec. 23, 2005) (citing

*Metropolitan Life Ins. Co. v. Hall*, 9 F.Supp.2d 560, 564 (D.Md.1998)); *see also Sun Life Assur. Co.*

*v. Tinsley*, No. 6:06-CV-00010, 2007 WL 1052485, at *4 (adopting *McCloskey*'s standard for

determining mental capacity and concluding that *McCloskey*'s statement of law "deserves deference

to promote uniformity of federal common law and ease of ERISA plan administration").

Moreover, "under the federal common law applicable in the context of insurance, there is a

presumption that an insured is mentally competent to change the beneficiary of his policy."

*McCloskey*, 2005 WL 3877436, at *2 (citing *Rice v. Office of Servicemembers' Group Life Ins.*, 260

F.3d 1240, 1247 (10th Cir. 2001)).  This presumption of competence may be overcome by a

preponderance of the evidence as to the factors derived from *Hall*. *Id.*

### B.      Undue Influence

According to the Sixth Circuit, "undue influence is generally defined as influence that is

sufficient to overpower volition, destroy free agency, and impel the grantor to act against the grantor's

inclination and free will." *Tinsley*, 227 F.3d at 705 (internal quotations and citations omitted).  Such

14

undue influence must also "so overpower and subjugate the mind of the testator as to destroy the testator's free agency and make the testator express another's will rather than his or her own." *Id.* Thus, a demonstration of "mere motive or opportunity" to unduly influence a testator is not enough to establish a claim of undue influence. *Id.* Rather, the undue influence must be *actually* exerted. *Id.*

Whether an individual has exercised undue influence over another is a highly fact-intensive inquiry. *Id.* The Sixth Circuit encourages courts to examine several factors, including:

> [T]he physical and mental condition of the benefactor; whether the benefactor was given any disinterested advice with respect to the disputed transaction; the "unnaturalness" of the gift; the beneficiary's role in procuring the benefit and the beneficiary's possession of the document conferring the benefit; coercive or threatening acts on the part of the beneficiary, including efforts to restrict contact between the benefactor and his relatives; control of the benefactor's financial affairs by the beneficiary; and the nature and length of the relationship between the beneficiary and the benefactor.

*Id.* (citations omitted).

## III.   Findings of Fact and Conclusions of Law

### A.     The 8/27/2011 Designation

The Court concludes that Reuben lacked the capacity to execute the 8/27/2011 designation and, thus, this designation is invalid as a matter of law.  First, Kenya admitted that she knew Reuben was incompetent by 8/27/2011 but asked him to execute a new beneficiary designation anyway.  *See* 8/4/2021 Transcript, 41:7-42:22.  Second, Dr. Syed noted on 7/23/2011 that, in his professional opinion, Reuben was unable to make any complex decisions for himself and would benefit from the appointment of a guardian.  (Doc. No. 1-9.)  Third, in her 5/1/2012 judgment entry, Judge Gallagher concluded that Reuben exhibited signs of forgetfulness, confusion, and difficulty managing his finances as early as 2009.  (Doc. No. 1-10.)  Neither Sharon nor Kenya presented any evidence to

15

suggest that Reuben was of clear mind and sufficient memory by August 2011. Having reviewed this evidence, the Court concludes that Reuben did not "have clearness of mind and memory sufficient to know the nature of the property for which [he] is about to name a beneficiary, the nature of the act which [he] is about to perform . . . and the consequences of [his] act, uninfluenced by any material delusion . . . ." *McCloskey*, 2005 WL 3877436, at \*6 (citing *Hall*, 9 F.Supp.2d at 564).

**B.     The 4/9/2011 Designation**

The Court concludes that the 4/9/2011 is invalid as a matter of law. Sharon admitted that she signed Reuben's name to the designation form via electronic signature, even though she was not yet appointed Reuben's guardian. 8/4/2021 Transcript, 22:2-20. Sharon asserts that this Court should not rely on the 4/9/2011 designation. *Id.* at 26:2-14. There is no evidence whatsoever that Reuben was aware of the 4/9/2011 designation, let alone made the 4/9/2011 designation himself. Accordingly, the Court concludes the 4/9/2011 designation is invalid.

**C.     The 4/17/2009 Designation**

The Court concludes that Kenya exercised undue influence over Reuben at the time he executed the 4/17/2009 designation, thus rendering the 4/17/2009 designation invalid as a matter of law.

**1.     Reuben's Physical and Mental Condition**

The evidence demonstrates that as far back as 2008, Reuben's physical and mental condition was in decline. As early as 2008, Reuben was unable to keep up with paying his bills. 8/4/2021 Transcript, 16:8-13. Moreover, around the same time, Reuben began displaying abnormal tendencies, like hoarding, and his house became unsanitary. *Id.* at 52:10-15. At one point, he had a bed bug infestation. *Id.* At another point, Reuben refused to allow his own son, visiting from Alaska, to enter

16

his home. *Id.* at 53:19-20. Further, he began struggling to maintain his physical appearance. *Id.* at 52:23-24. Additionally, in her 5/1/2012 judgment entry, Judge Gallagher concluded that "from at least 2009 forward Reuben Little began to exhibit signs of forgetfulness and confusion and was having difficulty in managing his finances." (Doc. No. 1-10.)

The Court does not believe Kenya's testimony that Reuben's mental and physical health were fine, especially in light of Sharon's testimony and Judge Gallagher's 5/1/2012 judgment entry. 8/4/2021 Transcript, 54:21. Moreover, the Court is not convinced that Reuben was physically and mentally stable in April 2009 simply because he was still driving a car at that time. As Sharon testified, Reuben continued to drive until the day the guardianship went into effect and that he drove while functionally incompetent. 8/4/2021 Transcript, 70:19-20. Indeed, Dr. Syed remarked in his 7/23/2011 competency evaluation that Reuben's driving history demonstrated that Reuben displayed "impaired judgment." (Doc. No. 1-9.) The Court is not persuaded that Reuben's mental condition was sound simply because he was behind the wheel of a car. Accordingly, the Court concludes that there is ample evidence to support the conclusion that Reuben's physical and mental condition was in decline, rendering him vulnerable to undue influence.

### 2. Whether Reuben Received Disinterested Advice

There is no evidence that Reuben ever received any disinterested advice with respect to his decision to name Kenya as the sole beneficiary in the 4/17/2009 designation.

### 3. The "Unnaturalness" of the Gift

The Court concludes that there is nothing about the 4/17/2009 designation that suggests the gift is "unnatural," as Kenya was Reuben's youngest daughter.

### 4. Kenya's Role in Procuring the Benefit

17

The Court finds that Kenya's testimony is not credible as to her role in procuring the benefit and her possession of the beneficiary designation form.  In Kenya's version of events, it was entirely Reuben's idea to change his Plan beneficiary designation so that only Kenya would receive any Plan proceeds.  8/4/2021 Transcript, 62:5-6.  According to Kenya, Reuben was insistent that they go together to the GM administrative offices to change the beneficiary form.  *Id.* at 29:1-31:4, 61:22-25. Kenya maintains that Reuben arrived unannounced to her Cleveland Heights home and drove her to the GM administrative offices in Parma, which they then visited without an appointment, so that Reuben could complete a new beneficiary designation form.  *Id.*  However, Kenya remembers very few details about the signing process itself.  For instance, Kenya testified that she could not remember whether Reuben was provided with a copy of the beneficiary designation form when they arrived, or if Reuben had already obtained the form a different way (although Kenya testified that she believed "that the representative there at General Motors presented the form").  *Id.* at 61:22-25.  Moreover, Kenya could not remember whether she left GM with a copy of the 4/17/2009 designation.  *Id.* at 63:9-14.

Kenya's version of events makes little sense.  For one thing, Kenya believed that the GM representative presented the designation form.  However, it is clear from the handwriting at the top of the 4/17/2009 designation that *Kenya* completed the designation form, not Reuben.  (*Compare* 4/17/2009 designation, Doc. No. 1-6, with 8/27/2011 designation, Doc. No. 1-5.)  The Court does not believe that Reuben insisted Kenya come with him to the GM administrative offices without an appointment, and that, upon their arrival, a GM representative presented *Kenya* with the designation form for completion, rather than *Reuben*.  Kenya's testimony is especially incredible in light of Judge Gallagher's 5/1/2012 conclusion that, during this *same* timeframe, Kenya exerted undue influence

18

over Reuben so that she could access his bank accounts and credit.  (Doc. No. 1-10.)  The Court simply does not believe Kenya's version of events.  Moreover, based on the Court's review of the handwriting at the top of the 4/17/2009 designation, there is some evidence that Kenya played a role in procuring this benefit.

### 5.    Coercive or Threatening Acts on the Part of Kenya

The Court concludes there is evidence that Kenya attempted to restrict Reuben from contacting his other children in 2009 by intentionally refusing to pay his telephone bills.  Sharon asserted that Kenya attempted to restrict Reuben's contact with his other children—including at least one who lived in Alaska—by not paying Reuben's telephone bills, ensuring that the phone service would be shut off.  8/4/2021 Transcript, 67:16-25.  While Kenya admitted that she "was aware" that Reuben's telephone service was shut off in or around April 2009, Kenya did not refute Sharon's assertion that Kenya intentionally neglected paying Reuben's phone bill to prevent Reuben from contacting his other children.  *Id.* at 68:1-19, 69:1-4.  Instead, Kenya asserted that she did not live with Reuben in April 2009—although she also testified that, as of April 2009, she was assisting Reuben with his financial affairs by paying his bills.[4]  *Id.* at 71:8-15, 72:2-5.  Kenya also reasserted her belief that Reuben was the victim of identity theft, which led to Reuben being unable to pay his bills.  *Id.* at 69:3-11.

Even though Kenya was purportedly "assisting" Reuben with paying his bills in April 2009, she does not explain *why* she failed to pay the phone bill.  Kenya's assertion about identity theft makes little sense and does not explain why *she* was unable to utilize cash from Reuben's account to

---

[4] While Kenya testified that she helped Reuben pay his bills in April 2009, she could not remember *which* bills she helped him pay.  8/4/2021 Transcript, 72:2-5.  One bill she did not help him pay was his mortgage, which apparently went completely unpaid while she was meant to assist Reuben with his finances.  *Id.* at 71:24-72:1.

pay his phone bill.  Kenya also did not attempt to explain why, if she knew Reuben's phone service was shut off, she did nothing to rectify the situation.  Kenya was responsible for assisting Reuben in paying his bills, Kenya knew that Reuben's phone service was shut off, but Kenya did nothing to address the problem—all while Reuben lived alone in his house and began living in increasing squalor.  The Court concludes that this evidence demonstrates that Kenya neglected paying Reuben's telephone bills to restrict Reuben from contacting his other children.

### 6.    Kenya's Control Over Reuben's Financial Affairs

The Court concludes that Kenya exerted significant control over Reuben's financial affairs in and around April 2009.  First, while Kenya testified that, as of April 2009, she did not have "complete control," she also testified that she assisted her father with his financial affairs by paying his bills in April 2009.  *Id.* at 72:2-5.  Second, in her 5/1/2012 judgment entry, Judge Gallagher concluded that Kenya "had access to Mr. Little's bank accounts and credit" throughout this time period.  (Doc. No. 1-10.)  Third, when Reuben "became suspicious that someone was taking all of his money," he "transferred his accounts to different accounts, which [Kenya] still had access to."  (Doc. No. 1-10.)  Fourth, Kenya used at least two credit cards, both of which were in Reuben's name: a Visa and a JCPenney store card.  8/4/2021 Transcript, 74:5-14.  Thus, Kenya had access to nearly all of Reuben's finances in and around April 2009.

It is clear that Kenya did not do a good job "assisting" Reuben in managing his finances.  Kenya admitted that Reuben's mortgage was not being paid at the time she was "assisting" him in paying his bills.  *Id.* at 71:24-72:1.  Kenya also admitted that she did not pay the balances on the JCPenney card, prompting JCPenney to call Reuben about his delinquent balances.  *Id.* at 32:15-23.

20

Additionally, as discussed above, Kenya knew that Reuben's telephone service was shut off, but Kenya apparently did nothing to rectify this problem.  *See supra*.  Kenya's unsupported assertions of identity theft lack credibility.  She does not explain how being a victim of identity theft prevented Reuben from paying his bills.  Instead, the Court concludes, based on Judge Gallagher's judgment entry, as well as Kenya's own testimony, that Kenya exercised her control over Reuben's accounts and credit for her own benefit, rather than to pay for Reuben's bills.

### 7.    Nature and Length of Reuben's and Kenya's Relationship

Finally, the Court concludes that the nature and length of the relationship between Reuben and Kenya weighs slightly in favor of a finding of undue influence.  Based on both Sharon's and Kenya's testimonies, Reuben cared for his daughter and wished to see her taken care of.  However, the Court is also mindful of Judge Gallagher's conclusion that Kenya "was aware of Mr. Little's vulnerability and that she used her position as his 'baby' to unduly influence him to allow her access to his accounts and credit."  (Doc. No. 1-10.)  Indeed, when asked whether Reuben told Kenya that she could open a JCPenney credit card in his name, she responded that she was "his baby."  8/4/2021 Transcript, 32:14.   Further, as discussed above, the Court does not find credible Kenya's testimony that Reuben's physical and mental condition was sound as of April 2009, nor does the Court believe that it was Reuben's idea to execute the 4/17/2009 designation, in light of the evidence that Kenya exercised control over Reuben's finances, neglected to pay many of Reuben's bills, and restricted contact between Reuben and his other children.  Examining these factors together, along with Judge Gallagher's conclusion that Kenya used her position as Reuben's "baby" to manipulate him into granting her access to his finances, the Court concludes that Kenya likewise used her position as Reuben's "baby" to convince her vulnerable father into designating her as sole beneficiary.

21

Having weighed these factors, the Court concludes that the evidence demonstrates that Kenya unduly influenced Reuben in and around April 2009 to designate Kenya as the sole Plan beneficiary. Because the Court concludes that Kenya unduly influenced Reuben to execute the 4/17/2009 designation, the Court concludes that the 4/17/2009 is invalid as a matter of law.

**IV.     Conclusion**

Based on the foregoing, the purported 8/27/2011, 4/9/2011, and 4/17/2009 designations are found to be invalid.  Therefore, the Plan proceeds should be distributed according to the 2/23/1982 designation to the following 5 beneficiaries as follows:

Sharon Little: 50% ($6,075.00)

Shareba Walker: 12.5% ($1,518.75)

Terrance Walker: 12.5% ($1,518.75)

Damone Walker: 12.5% ($1,518.75)

Kenya Walker: 12.5% ($1,518.75)

To receive disbursement of funds, the above 5 beneficiaries are each directed to provide the Court with a current address and a completed W-9 form.  The beneficiaries' addresses and W-9 forms shall be provided to the Court's Finance Department for disbursement of funds.

**IT IS SO ORDERED.**

                                  *s/Pamela A. Barker*
                                  PAMELA A. BARKER

Date: August 13, 2021             U. S. DISTRICT JUDGE